UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| COMPUGEN LTD., )<br>)<br>Plaintiff, )<br>)<br>-against- )<br>)<br>THE UNITED STATES OF AMERICA, )<br>)<br>Defendant. )<br>_____) | Case No. **25-643 T**<br><br>**COMPLAINT** |

Plaintiff, Compugen Ltd. ("Compugen"), by its undersigned counsel, for its complaint against the United States of America, by and through the United States Internal Revenue Service ("IRS"), alleges as follows:

### Nature Of The Case

1. This is an action for a refund of federal income tax erroneously withheld for the taxable year 2024 in the total amount of $13,500,000, plus all applicable statutory additions.

2. Compugen, an Israeli biotechnology company, entered into an agreement (the "Agreement") with a United States headquartered pharmaceutical company (the "US Company") regarding the research and development of a certain antibody. Pursuant to the terms of the Agreement, the US Company made two payments to Compugen in 2024, an upfront payment following the execution of the Agreement (the "Upfront Payment"), and a subsequent payment based on Compugen meeting a development milestone (the "Milestone Payment"). From these two payments, the US Company erroneously withheld taxes in the total amount of $13,500,000 (the "Withheld Amount").

3. With respect to the Upfront Payment, section 865(a) of the Internal Revenue Code (the "Code") sources the Upfront Payment to Israel. Since the Upfront Payment is not United States sourced, such amount is not subject to U.S. federal income tax and the US Company should not have withheld any tax on the Upfront Payment. Regarding the Milestone Payment,

1

since the only contingency related to that payment was the achievement of a certain milestone, which is a temporal requirement and not a sales related requirement, the Milestone Payment is not a contingent payment for the purposes of Code section 881(a)(4).[1]  Since the Milestone Payment was not a contingent payment for the use of an intangible asset, it is properly sourced to Israel and is not subject to United States tax.  The withholding on the Milestone Payment was, therefore, erroneous.

4. Compugen is entitled to a refund calculated as follows:

| | |
|---|---|
| Total Payment Due January 2, 2024 | $60,000,000 |
| Actual Payment Received on January 2, 2024: | $51,000,000 |
| Withholding Amount Under a Treaty @15%: | $ 9,000,000 |
| Amount that Should Have Been Withheld: | $          0 |
| Refund Due Compugen | $ 9,000,000 |
| | |
| Total Payment Due September 4, 2024 | $30,000,000 |
| Actual Payment Received on September 4, 2024: | $25,500,000 |
| Withholding Amount Under a Treaty @15%: | $ 4,500,000 |
| Amount that Should Have Been Withheld: | $          0 |
| Refund Due Compugen Ltd.: | $ 4,500,000 |
| | |
| Total Refund Due to Compugen | $13,500,000 |

5. On September 26, 2024, Compugen filed an IRS Form 843, Claim for Refund and Request for Abatement (the "Claim for Refund") requesting the refund of the Withheld Amount. More than six months have passed since the filing of Compugen's Claim for Refund, without a decision thereon, and therefore Compugen is now commencing this action for a refund pursuant to 26 U.S.C. §§ 6511, 6532, and 7422.

## Parties

6. Plaintiff Compugen is a company formed under the laws of Israel and treated as a corporation for U.S. tax purposes.  Its principal office address is 26 Harokmim Street, Holon, 5885849, Israel.  Compugen is a clinical-stage drug discovery and development company.  A

---

[1] All references are to the Internal Revenue Code of 1986, as amended, unless otherwise noted.

2

statement in accordance with Court of Federal Claims Rule 9(m)(2)(B) has been attached hereto as Exhibit 1 and is incorporated by reference in this Complaint.

7. Defendant United States of America is the government of the United States, as represented in this action by the IRS.

## Jurisdiction

8. This court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1346(a)(1) and §1491(a)(1) and 26 U.S.C. §7422, because this is an action for the recovery of income taxes and penalties wrongfully collected under the internal revenue laws.

## Facts

### A. Compugen's Research Agreement

9. Compugen is a clinical-stage cancer immunotherapy company and a pioneer in computational drug-target discovery. It uses its predictive computational discovery capabilities to identify new drug targets and biological pathways for developing certain immunotherapies. In particular, Compugen has developed an antibody that is the subject of the Agreement (the "Antibody").

10. On December 18, 2023, Compugen entered into the Agreement with the US Company. According to the Agreement, Compugen is responsible for conducting a Phase 1 clinical trial of the Antibody (the "Phase 1 Trial"). Thereafter, US Company will have the right to require Compugen to transfer the development activities related to the Antibody to the US Company, following which the US Company would have the responsibility to develop and commercialize the Antibody or other Antibody-related products (the "Products").

11. The Agreement outlines a phased research and development process to be followed in using the Antibody to develop and commercialize certain Products. These phases are individually discussed below.

12.    The Agreement expires on a product-by-product and country-by country basis upon the later of (i) 10 years from the first commercial sale of a Product in a particular country, (ii) the expiration of the last-to-expire patent covering that Product in a particular country, or (iii) the expiration of the last-to-expire period in which the US Company will have a regulatory exclusive right to market that Product in a particular country (the "Agreement Term").

      B.    **The Development Program**

13.    The first stage is described in Section 2 of the Agreement as the "Development Program".  During the Development Program, Compugen and the US Company will conduct the Antibody's clinical development and manufacturing activities required to achieve completion of the Phase 1 Trial in which a Product is first used in human subjects.  The Phase 1 Trial is intended to determine the safety and other properties of the Product.  Compugen is required to be the sponsor of the Investigational New Drug ("IND")[2] studies supporting the IND submission and the Phase 1 Trial, and as a result is required to apply and receive permission for the initiation of the Phase 1 Trial from the Food and Drug Administration.  During this stage, Compugen is responsible for all costs it incurs in connection with said Development Program activities.

14.    Following the completion of the Phase 1 Trial, Compugen is required to provide to the US Company all data and results related to the Phase 1 Trial.

      C.    **The Transfer**[3]

15.    If the US Company reasonably believes that Compugen is unable to or has failed to conduct the Phase 1 Trial, the US Company is allowed to take over the Development Program. The US Company also has the right to require Compugen to transfer the Development Program

---

[2] IND is a U.S. Food and Drug Administration mandated process related to the approval of new drugs to be tested in clinical trials.

[3] The various transfers to the US Company discussed in this section are collectively referred to as the "Transfer").

to it after the completion of the Phase 1 Trial.  In either case, Compugen is obligated to transfer to the US Company all development activities related to the development of any Product, including any clinical trials, analysis, studies, research, and development (the "Development Activities").  Compugen is also obligated to assist in the assignment of any agreements that Compugen has with any developers or manufacturers of the Antibody to the US Company.  Finally, Compugen is also obligated to make its personnel available to assist the US Company with activities related to any Product.

16.     If the US Company does not request the transfer of the Development Program to it, upon the expiration of a certain period, Compugen may wind down the Development Activities.

17.     Under the Agreement, Compugen also grants to the US Company an "exclusive, royalty-bearing, non-transferrable license … with the right to grant sublicenses through multiple tiers" (the "License") to exploit Antibody-related products under Compugen's patents and Know-How necessary or reasonably useful for such exploitation (the "IP") in the field of therapeutic or prophylactic uses, including treatment, palliation, mitigation, cure, control or prevention of a human disease, or medical or aesthetic conditions in humans, and companion diagnostic use in conjunction therewith (the "Field").  Compugen retains the right to conduct any development activities pursuant to the Development Program, the right to manufacture Products for the US Company, and to conduct certain regulatory activities related to Products if requested by the US Company and other "non-competing" activities (the "Retained Rights").

18.     During the US Company's exclusivity period under the License, Compugen is generally not allowed, subject to its Retained Rights, to research, develop, make, or commercialize any compounds, products or treatment methods that are broadly related to the Antibody or any companion diagnostics for a Product.

5

19. Additionally, Compugen is required to transfer to the US Company any proprietary scientific or technical information, results and data of any type whatsoever, in any tangible or intangible form whatsoever, including databases, practices, methods, techniques, specifications, formulations, formulae, knowledge, know-how, skill, experience, test data (including pharmacological, medicinal chemistry, biological, chemical, biochemical, toxicological and clinical test data), analytical and quality control data, stability data, studies and procedures, and manufacturing process and development information, results and data (the "<u>Know-How</u>"), necessary or reasonably useful to exploit Products in the Field.

20. Compugen is also required to transfer to the US Company all Know-How necessary for the manufacture of the Antibody. Following the Transfer, the US Company is granted the sole right to continue the development of the Products. The US Company is then responsible for all regulatory activities necessary to obtain the approval of any Product for commercial marketing and sale.

**D.     Payments under the Agreement.**

*1.     The Upfront Payment*

21. Within 15 days of the effective date of the Agreement, the US Company was obligated to pay Compugen the Upfront Payment, as described in Section 9.1 of the Agreement:

> In partial consideration of the rights granted by [Compugen] to [the US Company] hereunder within fifteen (15) days after the Effective Date, [the US Company] shall pay to [Compugen] sixty million US Dollars (US$60,000,000), which shall be non-creditable and non-refundable against any other payments due under this Agreement.

22. Following that, the Agreement describes the several categories of payments that are due to be paid to Compugen that fall into several categories based on the development and commercial sale of the Products: Research Milestone, Development Milestones, Regulatory Milestones, Commercial Milestones; and Royalties.

23. On or about December 16, 2023, Compugen provided the US Company a Form W-8BEN-E, Certificate of Status of Beneficial Owner for United States Tax Withholding and Reporting (Entities) in which it claimed benefits under Article 14, paragraph 1 of the United States-Israel Income Tax Treaty (the "Treaty"). A copy of the Form W-8BEN-E is attached as Exhibit 2. Under this provision of the Treaty, Compugen is entitled to a reduced amount of U.S. withholding tax on its receipt of patent royalties in the amount of 15 percent because it does not have a permanent establishment in the United States.

24. On January 2, 2024, the US Company made the Upfront Payment to Compugen in the gross amount of $60 million. The US Company took the position that withholding was required from the Upfront Payment, and therefore withheld $9 million and remitted this amount to the IRS.

### 2. *The Milestone Payment*

25. According to Section 9.2 of the Agreement,

> Subject to the terms and conditions of this Agreement, [the US Company] shall pay to [Compugen] the one-time, non-creditable, non-refundable milestone payment set forth in the table below in this Section 9.2 (Research Milestone Payment) after the first achievement of the applicable milestone event . . . For clarity, the Research Milestone Payment shall be payable only once, regardless of the number of times the corresponding Research Milestone Event is achieved.

| Research Milestone | | |
|---|---|---|
| **Number** | **Research Milestone Event** | **Research Milestone** |
| 1 | IND Clearance for the Antibody's [] Product | US$30,000,000 |

26. On July 29, 2024, Compugen announced that it achieved the Research Milestone.

27. On September 4, 2024, the US Company made the Milestone Payment in the amount of $30 million and withheld $4.5 million and remitted this amount to the IRS.

**Legal Analysis**

A.   **The Agreement Represents a Sale, not a License of Intangible Personal Property**

28.    The first step in the analysis of the Upfront Payment and the Milestone Payment is to determine whether each payment is made pursuant to a license agreement or a sale. In so doing, it is important to note that the labels that the parties affix to a transaction are not determinative of their true nature.[4] Thus, while the Agreement uses the term "license," and is titled a "License Agreement," this is not determinative of the nature of the transaction, the Upfront Payment, or the Milestone Payment for federal income tax purposes.

29.    For federal income tax purposes, payments for the use of patents, copyrights, and other like property are ordinarily classified as royalties.[5] In general, a royalty is a payment made to the holder of a property interest in exchange for the use of the subject property. In some circumstances, however, the consideration received in exchange for the use of an intangible asset is treated as the sale of personal property. For example, in Revenue Ruling 60-226, the IRS held that the consideration received for the transfer of an exclusive right to exploit copyrighted work throughout the life of the copyright is treated as the sale of property rather than as a royalty.[6] The IRS further concluded that this was the case regardless of whether the consideration received is measured based on a percentage of the receipts or based on the number of copies sold.

30.    In a subsequent Revenue Ruling, the IRS held that the unqualified transfer of the exclusive right to use a trade secret until it becomes public knowledge and no longer protectible under the laws of the country where the transferee operates is a transfer of property.[7] In so

---

[4] *See Kimble Glass Co. v. Comm'r,* 9 T.C. 183, 189 (1947).

[5] *Comm'r v. Affiliated Enterprises, Inc.,* 123 F.2d 665 (10th Or. 1941), *cert. denied*, 315 U.S. 812 (1942).

[6] Rev. Rul. 60-226, 1960-1 C.B. 26.

[7] Rev. Rul. 71-564, 1971-2 C.B. 179.

8

doing, the IRS indicated that, "[i]n order for a grant of patent rights to constitute a sale or exchange, the grant must consist of all substantial rights to the patent. One substantial right which must be transferred is the right of the transferee to use the patent for its full life, i.e., the remaining statutory length of the patent."[8]

31.    In a different context, in Revenue Ruling 58-353,[9] the IRS held that a transfer of rights to a patent, including an exclusive license agreement, is taxable as gain from the sale of property, even if, "measured by a fixed percentage of the selling price of the article so manufactured and sold, or amounts per unit based upon units manufactured or sold, or any other method measured by production, sale, or use either by assignee or licensee, or amounts payable periodically over a period generally coterminous with the transferee's use of the patent."

32.    Here, under the terms of the Agreement, Compugen granted an exclusive worldwide license to the US Company of all Compugen's right, title and interest in the IP to develop, commercialize and exploit the Antibody-related Products.

33.    The License is in effect starting from the date of execution of the Agreement and until the expiration of the last royalty term for an Antibody-related product in a country, that is defined in Section 1.213 of the Agreement to be:

> The time period beginning on the First Commercial Sale of a [] Product in a country and expiring on the latest of the following dates: (a) the tenth (10th) anniversary of the date of the First Commercial Sale of such [] Product in such country, (b) the expiration of the last-to-expire [] Patent covering such [] Product in the applicable country, and (c) the expiration of the last-to-expire Regulatory Exclusivity Period for such [] Product in such country.

34.    In effect, the License covers all Compugen's rights, title, and interest in the IP and grants the US Company an exclusive, worldwide license for functionally the total life of the IP.

---

[8] *Id.* (citing *Waterman v. Mackenzie*, 138 U.S. 252 (1891).

[9] Rev. Rul. 58-353, 1958-2 C.B. 408.

Much like Revenue Ruling 71-564, Compugen has thus transferred to the US Company, "the exclusive right to use a trade secret until it becomes public knowledge and no longer protectible under the laws of the country where the transferee operates." The exclusivity period granted to the US Company in the Agreement is in effect during the Agreement Term. In other words, the exclusivity period does not expire until the IP is no longer subject to legal protection in the relevant jurisdiction. Therefore, the Agreement represents a sale, not a license, of the IP to the US Company.

      **B.**    **The Sourcing of Sale Proceeds on the Sale of an Intangible by a Nonresident Corporation.**

35. According to Code section 865(a)(2), income from the sale of personal property by a nonresident is sourced outside the United States. In the case of the Upfront Payment, Code section 865(d) does not apply because the Upfront Payment is not contingent on the productivity, use, or disposition of any intangible. Accordingly, under Code section 865(a)(2), the Upfront Payment is sourced to the residence of Compugen, Israel.

      **C.**    **There is No Taxation of Sale Proceeds on the Sale of an Intangible by a Nonresident Corporation.**

36. Code section 881(a)(4) imposes a 30 percent tax on the income of foreign corporations from sources within the United States on gains from the sale or exchange of, "patents, copyrights, secret processes and formulas . . . and other like property, or any interest in such property, to the extent such gains are from payments which are contingent on the productivity, use, or disposition of the property interest sold or exchanged[.]"

37. Code section 1442(a) enforces the tax imposed by Code section 881(a)(4) by requiring the withholding of the 30 percent tax by the payee of income sourced in the United States. According to this section,

> In the case of foreign corporations subject to taxation under this subtitle, there shall be deducted and withheld at the source in the same manner and on the same items of income as is provided in section 1441 a tax equal to

10

>30 percent thereof. For purposes of the preceding sentence, the references in section 1441(b) to sections 871(a)(1)(C) and (D) shall be treated as referring to sections 881(a)(3) and (4)[.]

38. Code section 1441(b) indicates that the items of income subject to withholding and referred to in Code section 1441(a) include "gains subject to tax under Code section 871(a)(1)(D)." Code section 871(a)(1)(D) of the Code subjects gains from the sale or exchange of, "patents, copyrights, secret processes and formulas . . . and other like property, or any interest in such property, to the extent such gains are from payments which are contingent on the productivity, use, or disposition of the property interest sold or exchanged[.]" Code section 871(a)(1)(D) contains the same language as Code section 881(a)(4) as to the items of income subject to the 30 percent tax, and Code section 1442(a) incorporates Code section 1441's withholding requirement to foreign corporations subject to the 30 percent tax under code section 881(a)(4).

39. The Regulations further describe the applicability of the Code section 881(a) tax, and therefore whether withholding is required on a payment received by a foreign corporation. Section 1.871-11(a) of the Regulations defines a contingent payment for purposes of Code sections 871(a)(1)(D) and 881(a)(4) as,

>payments which are contingent on the productivity, use, or disposition of property or of an interest therein include continuing payments measured by a percentage of the selling price of the products marketed, or based on the number of units manufactured or sold, or based in a similar manner upon production, sale or use, or disposition of the property or interest transferred.

40. Further, Section 1.871-11(a) of the Regulations exempts from the definition of a contingent payment, and therefore the Code section 881(a)(4) tax, payments that are, "certain as to the amount to be received, but contingent as to the time of payment, or an installment payment of a principal sum agreed upon in a transfer agreement[.]" These payments, "shall not be treated as a contingent payment for purposes of [Treas. Reg. § 1.871-11(a)]."

41. Thus, payments received on the sale of patents, copyrights, secret processes, and formulas that are certain as to the amount to be received but contingent as to the time of payment are not contingent payments for the purposes of Code section 881(a)(4) and Section 1.871-11(a) of the Regulations. Accordingly, the tax imposed by Code section 881(a)(4) does not apply to the Upfront Payment or the Milestone Payment, and withholding under Code section 1442(a) was not required.

### D.     The Upfront Payment is Not Subject to Tax.

42. As discussed above, the Upfront Payment was made on January 2, 2024. According to the Agreement, the Upfront Payment was made in partial consideration of the rights granted by Compugen to the US Company. The Agreement makes clear that the Upfront Payment is not contingent upon any event occurring, any use of the License, or any commercial sales of Products. Rather, as a condition of entering into the Agreement, the US Company agreed to make the Upfront Payment.

43. Therefore, the Upfront Payment is not treated as a royalty sourced in the United States under Code section 865(d); instead, Code section 865(a)(2) sources the Upfront Payment to Israel. Since the Upfront Payment is not United States sourced, such amount is not subject to U.S. federal income tax and the US Company should not have withheld any tax on the Upfront Payment.

44. Here, the Upfront Payment is essentially being made in consideration of Compugen's efforts in developing the Antibody and for services provided by Compugen during the term of the Development Program. All of these activities took place outside of the United States prior to the effective date of the Agreement or thereafter, during the term of the Development Program, and all were paid for by Compugen. The US Company, under the Agreement, obtained tangible and intangible products created by Compugen and paid for by Compugen.

### E. The Milestone Payment is Not Subject to Tax.

45. The treatment of the Milestone Payment is addressed in Section 1.871-11(a) of the Regulations. According to that section, "a payment that is certain as to amount to be received, but contingent on the time of payment, or an installment payment of principal sum agreed up upon in the transfer agreement shall not be treated as a contingent payment for purposes of [Code section 881]."

46. As the Agreement states, the Milestone Payment is certain as to the amount received, as the Agreement identified the amount of the payment as $30 million. This payment is solely contingent on the timing of the payment, which is to be made, "after the first achievement of the applicable milestone event by a […] Product." When Compugen achieved this milestone, it received the Milestone Payment. The only contingency was the achievement of the milestone, a temporal requirement and not a sales related requirement, which means that the Milestone Payment is not a contingent payment for the purposes of Code section 881(a)(4).

47. Alternatively, the Milestone Payment is also properly treated as the payment of a principal sum agreed upon in the Agreement. Compugen and the US Company agreed in the Agreement that Compugen would receive a series of payments, one of which is the Milestone Payment. Under Section 1.871-11(a) of the Regulations, this type of payment is not subject to the withholding tax under Code section 881(a)(4) because it is not treated as a contingent payment subject to Code section 881(a).

48. Finally, the Milestone Payment is not contingent on the "productivity, use, or disposition" of anything. Becoming eligible for the Milestone Payment was based on work solely performed by Compugen, and not by the US Company. Compugen also funded the work necessary in order to reach the milestone. The Milestone Payment is essentially compensation for services performed by Compugen outside of the United States. As a result, there is no withholding tax due under Code section 881(a)(4) with respect to the Milestone Payment.

**F.      Compugen Exhausted Administrative Remedies Pursuant to 26 U.S.C. § 6532(a).**

49.     Because the Upfront Payment and the Milestone Payment are not subject to tax under Code section 881(a), the US Company should not have withheld the Withheld Amounts, and Compugen is therefore entitled to a refund of the Withheld Amounts.

50.     On September 26, 2024, Compugen filed the Claim for Refund on IRS Form 843. The Claim for Refund is attached hereto as Exhibit 3 (without exhibits).

51.     The statute at 26 U.S.C. § 6532(a)(1) provides:

> No suit or proceeding under section 7422(a) for the recovery of any internal revenue tax, penalty, or other sum, shall be begun before the expiration of 6 months from the date of filing the claim required under such section unless the Secretary renders a decision thereon within that time, nor after the expiration of 2 years from the date of mailing by certified mail or registered mail by the Secretary to the taxpayer of a notice of the disallowance of the part of the claim to which the suit or proceeding relates.

52.     More than six months have passed since the filing of Compugen's Claim for Refund. To date, the IRS has not rendered a decision thereon.

## Compugen's Refund Claim for 2024 Taxes

## Count I (Refund Pursuant to 26 U.S.C. §§ 6511 and 7422)

53.     Compugen repeats the allegations in paragraphs 1 through 52.

54.     The withholdings by the US Company of $9,000,000 for the Upfront Payment and $4,500,000 for the Milestone Payment were erroneous as described above.

55.     Consequently, the failure to abate the withholding of $13,500,000 for taxable year 2024 was erroneous.

56.     Therefore, Compugen is entitled to a refund under the general refund statutes at 26 U.S.C. §§ 6511 and 7422, plus reasonable litigation costs pursuant to 26 U.S. Code § 7430.

**Relief Sought**

WHEREFORE, Plaintiff demands judgment in its favor as follows:

    a.    the sum of $13,500,000, plus applicable statutory additions;

    b.    reasonable litigation costs incurred, pursuant to 26 U.S. Code § 7430; and

    c.    such other and further relief as this Court deems just and proper.

Dated:    Boston, Massachusetts
           April 15, 2025

SULLIVAN & WORCESTER LLP

By: */s/ Daniel P. Ryan*
Daniel P. Ryan, Esq.
One Post Office Square
Boston, MA 02109
T: 617.338.2800
F: 617.338.2880
dryan@sullivanlaw.com

and

Anna Lea McNerney, Esq.
1251 Avenue of the Americas
New York, NY 10020
T: 212.660.3020
amcnerney@sullivanlaw.com

*Attorneys for Plaintiff*

15